NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-960

ADOPTION OF JANICE (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial in the Juvenile Court, a judge terminated the mother's parental rights to her children, Janice and Gerald.[2]  We have carefully considered the parties' arguments and are satisfied that the Department of Children and Families (department) proved by clear and convincing evidence that the mother was permanently unfit to parent the children.  We likewise discern no abuse of discretion or other error in the judge's determination that the department made reasonable efforts to reunite the family before seeking to terminate the mother's parental rights.  Accordingly, we affirm the decrees.

---

[1] Adoption of Gerald.  The children's names are pseudonyms.

[2] The children's father stipulated to his unfitness and entered into an open adoption agreement as to the children.  He has not appeared in this appeal.

Discussion. 1. Standard of review. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). Clear and convincing evidence means that "[t]he requisite proof must be strong and positive; it must be 'full, clear and decisive.'" Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997). "We review the judge's findings with substantial deference, recognizing [the judge's] discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of Nancy, 443 Mass. 512, 515 (2005), "and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra.

2. Evidence of the mother's unfitness. In this case, the judge made 335 "specific and detailed findings in support of [the] conclusion that termination [was] appropriate," and set down her conclusions of law with similar care. Adoption of Nancy, 443 Mass. at 514-515. With one exception that we address infra, the mother does not challenge the judge's findings as clearly erroneous.

2

The judge properly considered the fact that the mother's use of marijuana was so heavy that she regularly spent nearly all of her monthly income on the drug, see Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018) (financial instability is proper consideration in unfitness determination, although insufficient on its own to justify termination of parental rights), and that she had to travel out of state to buy marijuana because her demand for it required her to buy more than the amount authorized for purchase under Massachusetts law. More importantly, the judge also considered the potential risks to the children posed by the mother's misuse of marijuana; the judge considered both the mother's failure to follow her safety plan for the children's supervision in light of her daily marijuana use, see Adoption of Zoltan, 71 Mass. App. Ct. 185, 190 (2008), quoting G. L. c. 210, § 3 (c) (xii) (judge may consider parent's drug use where such use "makes the parent . . . unlikely to provide minimally acceptable care"), and the mother's 2022 charge and later conviction of operating a motor vehicle under the influence of marijuana.[3]  See Care & Protection of Frank, 409 Mass. 492, 494 (1991) (operating under the influence conviction relevant to, although generally not

_____

[3] There was no evidence that the children were in the car at the time of this offense.

3

dispositive of, unfitness determination).  The mother highlights her testimony that, between 2022 and the trial date in the present case, she had reduced the amount of marijuana she used to four ounces per month, and that she would use marijuana only twice a day unless her needs increased based on the onset of a panic attack.  We note, however, that the judge found that the mother often uses marijuana "more frequently" than twice a day "to manage her anxiety and disorders."

Yet, the mother's misuse of marijuana was not the only evidence of unfitness on which the judge relied.  Most significantly, the judge also considered the mother's long history of mental health concerns, both independently and as they intertwined with her reliance on marijuana.  The judge found that, despite the mother's having been diagnosed with several mental health and other conditions[4] and having been prescribed an array of medications to manage those conditions, by the time of trial, she had opted to forego additional mental health treatment and had stopped taking prescribed medication in favor of self-medicating with marijuana several times each day.

_____

[4] Specifically, the mother was diagnosed with schizoaffective disorder, schizophrenia, multi-personality disorder, generalized anxiety disorder, panic disorder, posttraumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), dyslexia, bipolar disorder, and major depressive disorder.  The mother has also been diagnosed with autism.

4

The judge also found that the mother's belief that her marijuana use effectively managed her mental health conditions and symptoms was inaccurate, as evidenced by, inter alia, her dysregulated conduct during the trial.[5]

Additionally, the judge found that, though the mother briefly engaged in dual diagnosis (mental health and substance misuse disorder) treatment with her individual therapists, she initially had been resistant to, and ultimately had failed to, complete a dual diagnosis program, despite the recommendations of both her mental health providers and the department.[6] Although the mother contends otherwise, we are not persuaded that the judge's findings on this point were clearly erroneous; the mother's social worker testified that the mother was resistant to the dual diagnosis programming, and to the extent the mother testified otherwise, the judge did not credit that testimony. There was also evidence to show that, although the mother ultimately agreed to participate in the dual diagnosis

---

[5] The judge found that, at trial, the mother "yelled and screamed at [opposing counsel]" from the witness stand, "abruptly left the witness stand and went to walk out of the courtroom" on the first day of trial, and, on another day, had a panic attack and sat under the sink in a courthouse restroom until the court clinician was able to calm her.

[6] There was testimony that the mother's psychiatrist was concerned about the amount of marijuana that the mother was smoking and its potential interactions with her medications.

programming, she was unwilling or unable to complete it in a group format. Moreover, after the department accommodated the mother's request that her individual therapist be permitted to provide dual diagnosis services, the mother was discharged from ensuing treatment before she had completed it because her providers concluded that they were no longer able to help her. As we have noted, beyond the mother's inconsistent response to participating in dual diagnosis programming, the judge additionally found that, by the time of trial, the mother had decided not to reengage with psychiatrists and instead planned to continue to self-medicate with marijuana, though she has not addressed her use of medical marijuana with a doctor since 2018.

We recognize that, in determining parental fitness, a parent's mental illness "is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's . . . needs." Adoption of Frederick, 405 Mass. 1, 9 (1989). Here, in addition to considering the fact of the mother's marijuana use and mental health concerns, the judge considered the impact of those factors on her ability to parent Janice and Gerald. The judge properly considered the mother's persistent inability or unwillingness to meet the children's basic needs,[7] see Adoption

[7] This included the mother's failure to ensure that the children were fed safely and in adequate amounts while they were

of Oliver, 28 Mass. App. Ct. 620, 624-625 (1990) (parent found unfit where infant was unable to gain weight, among other issues, and parent showed "no comprehension of [the infant's] problems and d[id] not acknowledge that he ha[d] problems" that were exacerbated by his environment); the mother's inability to manage her temper with the children,[8] see Adoption of Eduardo, 57 Mass. App. Ct. 278, 283 (2003) (mother's inability to "control[] her volatile nature" or address her mental health problems constituted continuing risk to child and supported finding of unfitness); the mother's failure to ensure that the children did not have access to the marijuana and related paraphernalia in her home,[9] see Adoption of Elena, 446 Mass. 24, 27 (2006) (mother's unsafe practices, which exposed children to drugs and drug paraphernalia, among other risks, were relevant to finding

_____

in her custody, and her later failure to come to visits with the children properly prepared with supplies. The mother also testified that she "does not have the mind to buy healthy snacks when she is at the grocery store." As babies, both children had difficulty gaining weight and, when Gerald's weight was in the first percentile, the mother refused weekly weight checks.

[8] When Janice was approximately six months old, the mother called her a "bitch" because she was resistant to the mother's efforts to "train" her to eat more at one time, which was more convenient for the mother.

[9] Both children were born exposed to marijuana. The mother also refused to show the department where she stored her marijuana, and she admitted that, because Gerald had grabbed at her vape pen, she put it in her boot.

of her unfitness); and the mother's misrepresentation of and failure to comply with the instructions of the children's health care providers,[10] see Adoption of Dora, 52 Mass. App. Ct. 472, 478 (2001) (noting that failure to heed medical advice is relevant to finding of parental unfitness).  The judge therefore did not rely exclusively on the mother's marijuana use or mental illness in determining that she was permanently unfit to parent Janice and Gerald, and we are satisfied that the evidence on which the judge did rely clearly and convincingly established the mother's permanent unfitness.

3.  Reasonable efforts.  "Where a parent, as here, has cognitive or other limitations that affect the receipt of services, the department's duty to make reasonable efforts to preserve the natural family includes a requirement that the department provide services that accommodate the special needs of [the] parent."  Adoption of Ilona, 459 Mass. at 61.  In her briefing, the mother argues that the department was aware from the inception of these cases that her ongoing mental health history and neurodevelopmental condition affected both her

_____

[10] The mother was unable to follow the pediatrician's advice regarding feedings for Janice and Gerald, and she was unreceptive to redirection.  When Janice was approximately seven months old, the mother told the department that "Janice is being ridiculous.  I'm not going to put [up] with her screaming for a bottle.  I'm going to make her wait to eat and feed herself."

parenting ability and her receptivity to the department's involvement in the family's life. She also argues forcefully that, given the department's awareness of her longstanding mental health history and its effect on her parenting; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; and the department's own disability policy, the department was required to make proactive efforts to determine how to address her needs. The mother did not, however, raise these concerns in the trial court. As a result, they are waived. See Adoption of Gregory, 434 Mass. 117, 124 (2001);[11] Adoption of West, 97 Mass. App. Ct. 238, 242 (2020).

Still, were we to reach the merits of the mother's reasonable efforts challenge, see Adoption of Chad, 94 Mass. App. Ct. at 839 n.20, we would discern no abuse of discretion or other error in the judge's determination that the department made reasonable efforts in this case. The department's efforts appear to be tailored to the mother's individual needs and parenting deficits, although the judge found that the mother made only limited use of some of the accommodations she was offered. The judge also found that parent aides have been a

---

[11] We acknowledge the mother's doubts about the vitality of Adoption of Gregory in light of the department's adoption of its disability policy as a term of its settlement of disability discrimination claims against it. Nonetheless, as the mother appears to recognize, the holding of that case is binding on us.

9

great support for the mother but, despite consistent engagement with them, the mother "still testified to difficulties understanding and remembering spoken information, struggles to schedule and attend appointments, . . . anxiety and panic attacks when out in the community, and" an inability to prepare for visits.

In addition, the judge found that the department used visual aids, including by supplementing written descriptions of certain tasks with pictorial prompts to assist the mother in understanding and prioritizing her action plan tasks, but that the mother did not use them. Where it does not appear that the department's concerns about the mother's parenting turned on her ability to prioritize her action plan items, we are not persuaded that the department's reasonable efforts required it to color code the mother's action plan items.

The judge also found that the mother's social worker reviewed the mother's action plan with her monthly during home visits, and -- based on the mother's testimony -- found that "[the] [m]other was aware of the tasks on her action plan and understood what the [d]epartment was asking of her." We perceive no abuse of discretion in the judge's reasonable efforts determination regarding the mother's social worker's alleged failure to "collaborate with [the mother's] attorney to simplify the wording of the action plan."

10

Lastly, where the mother has failed to gain insight or make significant progress toward parental fitness from the services she has engaged in through the department, and has decided to forego any mental health treatment beyond her self-medication with marijuana, we discern nothing unreasonable in the department's suggestion that the mother consult outside providers (her private social worker or her former program) for help in finding suitable care.

<u>Decrees affirmed</u>.

By the Court (Massing, Hand & Hershfang, JJ.[12]),

Clerk

Entered: August 7, 2025.

---

[12] The panelists are listed in order of seniority.

11